UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

————————————————————

JOSEPH KIMBLE,

                         Petitioner,

        -vs-

MICHAEL McGINNIS, Superintendent,
Southport Correctional Facility,

                      Respondent.

————————————————————

**REPORT AND RECOMMENDATION**
**No. 03-CV-0235(RJA)(VEB)**

## I.      Introduction

*Pro se* petitioner Joseph Kimble ("Kimble" or "petitioner") has filed a petition for a writ

of habeas corpus under 28 U.S.C. § 2254 challenging the legality of his custody pursuant to a

judgment entered October 16, 1997, in Erie County Court of New York State Supreme Court,

convicting him of two counts of second degree (intentional and felony) murder; one count of first

degree robbery; and one count of second degree criminal possession of a weapon. This matter has

been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1). For the reasons that follow, I

recommend that habeas relief should not issue and the petition should be dismissed.

## II.     Factual Background

Kimble was indicted and charged in the fatal shooting of John Schaus ("Schaus" or "the

decedent"), as Schaus was making a bank deposit on behalf of his employer on the evening of

March 31, 1995. As the Appellate Division noted on appeal, "[t]he evidence presented by the

People was entirely circumstantial." *See People v. Kimble*, 289 A.D.2d 1062, 736 N.Y.S.2d 210

(App. Div. 4th Dept. 2001),[1] *lv. denied*, 98 N.Y.2d 638 (N.Y. 2002). The only eyewitness to the crime, was Tara Hawkins ("Hawkins"), the decedent's co-worker. However, Hawkins was unable to identify Kimble as the shooter.

It was about 7:30 p.m. on a Friday night and Hawkins and Schaus were transporting the day's receipts to the night depository at the Marine Midland Bank on Bailey Avenue in Buffalo. T. 115, 116.[2] Schaus was driving; Hawkins was in the passenger's seat.

When they arrived at the bank, Schaus got out of his car to the make the deposit and Hawkins remained in the car. The deposit, about $6,500 in cash and checks, was in a heavy canvas pouch with a metal lock. T.115-17. When Schaus was within 5 feet of the bank deposit box, Hawkins saw him look to the right. T. 119. Hawkins looked in that direction and saw two men in dark clothes approaching Schaus. One man, who was black and was wearing a cap, pulled out a gun. T.120-21. Hawkins was unable to identify him, however.

Upon seeing the gun, Schaus threw down the canvas bag and began walking backwards with his hands in the air. Hawkins testified that words were exchanged between Schaus and the two men. Then the man holding the gun bent down, picked up the bag, stood up, and started shooting at Schaus. T. 121. Schaus turned and began running toward Bailey Avenue as the

---

[1] "Several motorists testified that they observed defendant in the vicinity of the crime around the time of the shooting; fresh footprints in the snow led to the house of a witness who testified that defendant came there at a time that approximates the time of the crimes; the murder weapon was found along the trail from the crime scene to that witness's house; and the description of defendant given to the police by that witness on the night of the crimes matched the description of the suspect given by the motorists who testified at trial. Moreover, a witness testified that, on the day following the crimes, defendant told him that he was involved in a crime in which "a kid got shot" on Bailey Avenue when the gun went off 'mistakenly'. Another witness testified that defendant told him one week after the crimes that he had committed a robbery and that someone had been killed." *People v. Kimble*, 289 A.D.2d at 1063.

[2] Citations to "T.__" refer to pages in the trial transcript.

gunman followed him, firing his weapon three times and hitting Schaus twice. T. 122. Schaus

collapsed on the street and died as a result of injuries to his vital organs sustained by one bullet

that entered his left lung and heart through his back. *See* T.520-21, 525-27.

The man who had been shooting approached the vehicle, so Hawkins began honking the

car's horn. The gunman's companion said something to the effect of, "come on," T. 123, and

both men then fled the scene. According to Hawkins, they ran down the driveway on the left side

of the bank between the bank and the building next door. T. 124

Two hours before the murder, Buffalo Police Detective Salvatore Valvo ("Det. Valvo")

had seen petitioner in Precinct 16, which was just a few blocks from the bank where the shooting

occurred. Det. Valvo recalled that petitioner remained at the precinct until about 6:30 PM. T.372,

383. About forty-five minutes later, at 7:15 p.m., Det. Valvo saw petitioner walking on Bailey

Avenue near the bank. T. 372. (As noted above, this was about fifteen minutes before the

shooting occurred.) Although Detective Valvo could not describe petitioner's apparel, he

remembered commenting that petitioner had changed his clothes from when Det. Valvo had seen

him at the precinct. T. 373. Within 10 minutes of seeing petitioner on Bailey Avenue (i.e., at

about 7:25 p.m.), Det. Valvo heard the radio call regarding the shooting. T. 374.

Several motorists driving down Bailey Avenue at the time heard a few shots and then saw

a young black man dressed in dark clothes run north on Bailey and then turn right on East

Amherst Street. *See* T.142, 147-48, 154.

At the crime scene near the bank, the police found some footprints in the wet snow that

had fallen earlier that day. In some shrubs on the front, right side of the bank, the police found a

boot print. A similar boot print, as well as some sneaker prints, led from the driveway of the bank

toward a fence and through a parking lot. T.346-47. A boot print and a sneaker print were found on the lawn of the elementary school adjacent to the lot. These prints appeared to have been made by people who were running. T.349.

Crossing Amherst Street, the police found three sets of footprints on the driveway of a house on East Amherst. T.349-76. The appearance of these three sets of prints suggested that the people had stopped and looked around. T.377. Detective Valvo searched the area and found a gun secreted underneath an old washing machine in the yard of this house. T.351, 377. This was the murder weapon. *See* T.377, 532-38. After finding the gun, the police continued following the footprints to a side door at the house at 437 Berkshire, which ran parallel to East Amherst.

One set of footprints led into a garage at 437 Berkshire, a duplex that was a known drug house. A boot print was discovered on the first step of the side entrance to the house. T.352, 379-80. The police were admitted by apartment's occupant, a woman known to Detective Valvo as "Bobbie". *See* T.351, 375.

Bobbie, whose real name was Brenda Baldon ("Baldon"), admitted to being a longtime crack addict. T.471, 477-78. She had known petitioner his entire life; in fact, one of her daughters had recently been dating him. T.445. At about 7:30 p.m. on the night of the shooting, petitioner, along with two young men whom Baldon knew as "Ray" and "Twan", rang the doorbell at the side door and then at the front door. T.450, 512. Baldon let them in. To her, they appeared "rushed" and "nervous". T.452. Petitioner was wearing a green cap and army green-colored clothing. Baldon observed that he had a bulge in the chest area of his jacket. T.453.

When Baldon told them she was getting ready to go out, petitioner, "Ray" and "Twan" went to the downstairs apartment and then to the basement. A few minutes later, "Twan"

knocked at the back door and asked Baldon for a butcher's knife. T.454. She told him to get one himself, and shortly after that, she heard a door slam. Baldon assumed that the three men had left. She later noticed that a knife had been taken. T.462.

Some days later, Baldon found a cap and jacket in her basement. T.457. After laundering them, she turned them over to the police. The jacket belonged to "Twan" and the cap was similar to the one worn by petitioner on the night they had come over to Baldon's house. T.453.

Baldon admitted that when she initially spoke to the police, she did not give them the names of the three individuals who had come to her house on the night of the shooting, and did not tell the police about the request for a butcher's knife T.456, 464, 484. Baldon said that she was afraid that if petitioner had indeed killed someone, he would not hesitate to do it again. T.457, 461.

Ten days after the shooting, Baldon called the police because she was "losing sleep" about not being forthcoming. However, Baldon said, she was forced to hang up the phone because her daughter (who was dating petitioner) did not want her to say anything. Then, when a police officer came over to the house, Baldon's daughter called her a "snitch" and said that they would both be killed if Baldon talked to the police.

The prosecution also called Floyd Martin ("Martin"), a former convict, who had known petitioner for three years prior to incident. T.552, 565, 569. On March 31, 1995, Martin drank heavily while working at his job as a dishwasher. T.572. Later, he was sleeping off his binge on the couch in his living room when he was awakened by someone knocking on his door at about 7:30 a.m. T.571-72. It was petitioner. According to Martin, petitioner kept him awake because he was pacing back and forth and repeating that "something was wrong" and "something had

happened." T.552-53, 571. Martin asked him what had happened, and petitioner finally said, "[O]h, man, Floyd, a kid got shot." T.555. Petitioner told Martin that he "accidentally" shot someone in the back on Bailey Avenue and that he thought that the person was dead. T.555-57. Within an hour after petitioner left his apartment, Martin heard about the murder on television. About two weeks later, after getting drunk, Martin went down to Precinct 16 in the Bailey Avenue neighborhood and announced that he knew the identity of the person who shot Schaus outside the bank. T.540-41, 559-60. However, the police detectives at the precinct ignored Martin because he was so intoxicated, eventually sending him home. *Id.*

Finally, the prosecution called John Sullivan ("Sullivan"), who had sustained convictions for sexual assault, reckless assault, and felony and misdemeanor drug charges in both Buffalo and Georgia. Sullivan testified that he had known petitioner in Buffalo. About a week after the March 31, 1995 shooting, Sullivan had gone down to Georgia. There he met up with petitioner and "Ray" (whose real name was Erandus Everett) at a hotel in downtown Atlanta. T.163-65. Sullivan, petitioner, and Ray sat around drinking cognac and smoking marijuana. *See* T.168-70. Sullivan asked petitioner "did you catch some bodies?" *Id.* By that question, Sullivan was asking petitioner "something to the effect of what happened, did he kill somebody." Petitioner "smiled a little" and "shook his head" signaling, "yes." Petitioner "was basically saying, we hit a lick," which means "[r]obbing and stealing, get[ting] some money somehow." *Id.* By "we", petitioner was referring to "Ray". *Id.* According to Sullivan, "they went down Westminster - - he didn't say Westminster, he said the street next to the bank, and the street next to the bank is Westminster." *Id.* As far as the proceeds from the robbery, petitioner told Sullivan that "there was some checks or something, some checks. Money, checks and cash." *Id.* Petitioner said that they "got the cash"

but "got rid of the checks" from the robbery. According to Sullivan, petitioner said that "they ran in some fiend's house". "Fiend" means a "[c]rack head . . . [a] [l]ady on crack or something." *Id.* Sullivan testified that petitioner did not tell him what route they took. *Id.* When asked if there was any discussion about who did the robbery with petitioner, Sullivan replied, "Well, he said - - he said him [sic] and Ray was [sic] together." *Id.*

Sullivan denied that he was an informant but admitted to being on good terms and in frequent contact with the assistant district attorney handling petitioner's case. In April 1995, Sullivan contacted the prosecutor and recounted the conversation he had with petitioner and "Ray" at the hotel in Atlanta. T.182. Sullivan admitted that he received probation on the Georgia felony drug charge after his 1996 conviction, and was continued on probation there even though he violated the conditions of his probation and got arrested and convicted in Buffalo. T.180. Sullivan also admitted that he was interested in obtaining the $25,000 reward money being offered for information about Schaus' killer. T.203-04.

## III.    Standard of Review

Under AEDPA, federal courts apply a deferential standard of review when reviewing a habeas corpus petition by a prisoner challenging a state court conviction that was adjudicated on the merits. 28 U.S.C. § 2254(d). When a petitioner's claim has been adjudicated on the merits in state court, habeas relief will be available only if the petitioner can show that the state court decision: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.*

For the reasons that follow, Kimble has not demonstrated that the state court's holding on his evidentiary claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2).

## IV.    Analysis of the Petition

Kimble states that he is entitled to habeas relief on the basis that he was deprived of a fair trial based on the jury's viewing of about four or five seconds of the autopsy videotape, which showed the decedent's naked corpse. Because there has been an "adjudication on the merits" of Kimble's claim by the state courts, the deferential standard of review set forth in 28 U.S.C. § 2254(d), as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") of 1996, governs this Court's resolution of the issue.

At Kimble's trial, the prosecutor introduced into evidence and played for the jury a videotape of the crime scene filmed by the Buffalo Police Department on the night of the shooting. Toward the end of the videotape, the scene shifted from the crime scene in front of the bank to "a well-lit, full-body view of the deceased victim . . . as he lay naked on a table in the morgue, an intubation tube still in his mouth." Petitioner's Appellate Brief at 20 (citing People's Exhibit No. 38, T.300-04). This tape of the autopsy ran for about four and five seconds, T.303-03, before the prosecutor was able to turn off the VCR machine. *See id.* The video apparently "cut off . . . when the body was in full view but just as it was starting to zoom in but before it had really had zoomed in on the body." T.302.

Defense counsel moved for a mistrial, arguing that the display of this autopsy footage

effectively "brought the body [of the victim] into the courtroom." T.309; *see also* T.304-05.

Noting that the footage in question had upset members of the decedent's family present in the

courtroom, defense counsel argued that the sight of decedent's corpse on the autopsy table was so

inflammatory and upsetting that any curative instructions the court could deliver would be

inadequate to alleviate the prejudice to the defense. T.305.

The prosecutor apologized and insisted that the display of the autopsy footage was

inadvertent and argued that the image was "nothing gory or upsetting about the scene other than a

dead body." T.306. There were "no signs of blood, no signs of gore, [and] the body had not been

opened." T.306. The prosecutor stated that, in any event, he intended to introduce several

photographs depicting the gunshot wounds to the decedent's body, because they were relevant to

the issue of whether the victim had been shot in the back or from the front. T.306-07. Those

photographs, argued the prosecutor, would show close-ups of the body and a probe going from

the back to the front showing the course of the bullet. T.306-07. The prosecutor conceded that

petitioner's family had reacted emotionally but asserted that he had not detected such reactions

from the jurors when he had a chance to look at them after he turned off the VCR. T.307.

The trial court, after questioning the police witness and the prosecutor regarding how

such an error with the videotape could have occurred, reserved decision on the issue of curative

instructions and the defense motion for a mistrial. The following day, the trial judge instructed

the jury to disregard the portion of the videotape depicting the decedent. *See* T.330-31. He then

asked the jurors, collectively, whether any of them would have a problem putting the autopsy

footage out of their minds, and whether any of them would have any difficulty continuing to

serve on the jury after as a result of their having viewed the videotape. *Id.* No jurors voiced any

concerns in response to the judge's questioning. *See id.* Defense counsel thanked the court and

did not indicate that he had problems with the curative instructions at that time.[3]

Later that day, the trial judge ruled from the bench regarding defense counsel's motion for

a mistrial, holding that the videotape footage in question "was not inflammatory to the point that

it would affect the Defendant's - - it would affect in any way the Defendant's claim of prejudice

or rather - - it does not prejudice the Defendant, let me put it clearly on the record, and the Court

hereby for the record again, denies the motion of [defense] Counsel to declare a mistrial." T.403.

Defense counsel took exception, reiterating his argument that no curative instructions were

sufficient to dispel the prejudice to petitioner and a mistrial therefore was warranted. *Id.*

On direct appeal, the Appellate Division rejected this claim because "[t]he jury's viewing

of the autopsy videotape was inadvertent, and the videotape was not presented by the People for

the purpose of arousing the emotions of the jury[.]" *Kimble*, 289 A.D.2d at 1062 (citations

omitted). The state court found that, "[i]n any event, [the trial court] issued a curative instruction,

which the jury is presumed to have followed[.]" *Id.* (citations omitted). Accordingly, the

---

[3]    The trial judge instructed the jury as follows:

And at a point, at the completion of the crime scene video, a scene appeared on the videotape
portraying what apparently was the morgue showing the victim in a room on an examining table.
The scene was portrayed for approximately three to five seconds before it was turned off. I am now
instructing you that you are to disregard that portion of the tape showing the body and not to
consider the scene as evidence in the case. Do not consider it at all in determining the guilty or the
nonguilt of the Defendant. It should play no part in any of  your deliberations or determinations to
be made at this trial. Now having said this, do any of you have any problem with doing this?
You're sure now? Let the record indicate that there's no response by any juror indicating any
problem. Now having so instructed you, I will now ask you if anyone has difficulty continuing as a
juror in this case because you observed the three to five second autopsy video? Anybody have any
trouble continuing. Again let the record indicate that no affirmative response has been shown by
any of the jurors.

T.330-31.

Appellate Division found, Kimble was not deprived of a fair trial. *Id.*

In his habeas petition, Kimble claims that the trial court, and then the Appellate Division, erred in their evidentiary rulings concerning the introduction of the portion of the videotape showing the decedent's unclothed corpse on the autopsy table. As a matter of New York state evidentiary law,

> [T]he general rule is that photographs of the deceased are admissible if they tend to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered or to be offered. Admission of photographs of homicide victims is generally within the discretion of the trial court. Where they are otherwise properly admitted as having a tendency to prove or disprove some material fact in issue, photographs of a corpse are admissible even though they portray a gruesome spectacle and may tend to arouse passion and resentment against the defendant in the minds of the jury. There are many cases in which photographs of a homicide victim have been held admissible to show, for example, the position of the victim's body, the wounds of the victim, or to illustrate expert testimony. Photographic evidence should be excluded only if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant.

*People v. Pobliner*, 32 N.Y.2d 356, 369 (N.Y. 1973) (internal citations omitted) (rejecting claim that admission into evidence of large color photographs of the decedent's body in the bed where she was shot, and two taken at the morgue, were improper and prejudicial; photographs related to material issues in the case (e.g., the prosecutor argued that defendant had killed his wife as she slept; the photographs confirmed that the deceased was in her bed, in a sleeping position, when shot).

There does not seem to be any colorable argument that the autopsy footage displayed at Kimble's trial was in any way relevant to proving a material issue. Thus, it would not have been admitted as a matter of New York state law had the prosecution moved the court for permission to do so. *See People v. Pobliner*, 32 N.Y.2d at 370. However, it is well-settled that "federal

habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780

(1990); *accord*, *e.g. Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *see also* 28 U.S.C. § 2254(a).

Thus, mere errors of state evidentiary law do not provide grounds for habeas relief unless those

errors worked to deprive the petitioner of due process under the Fourteenth Amendment. *E.g.*,

*Estelle v. McGuire*, 502 U.S. at 70. Erroneously admitted evidence does not deny a petitioner a

fair trial unless, "viewed objectively in light of the entire record before the jury, [it] was

sufficiently material to provide the basis for conviction or to remove a reasonable doubt that

would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985)

(noting that the evidence must have been "'crucial, critical, highly significant'") (quoting *Nettles*

*v. Wainwright*, 677 F.2d 410, 415 (5th Cir.1982). The Supreme Court has held, "[t]he

introduction of improper evidence against a defendant does not amount to a violation of due

process unless the evidence 'is so extremely unfair that its admission violates fundamental

conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d at 125 (quoting *Dowling v. United States*,

493 U.S. 342, 352 (1990)). As the Second Circuit stated another way, "For the erroneous

admission of other unfairly prejudicial evidence to amount to a denial of due process, the item

must have been 'sufficiently material to provide the basis for conviction or to remove a

reasonable doubt that would have existed on the record without it.'" 137 F.3d at 125 (quoting

*Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir.1992) (internal quotation marks omitted); citing

*Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985) (evidence must be "crucial, critical, highly

significant" (internal quotation marks omitted)). In assessing materiality, the reviewing court

must look at "the erroneously admitted evidence 'in light of the entire record before the jury.'"

*Id.* (quoting *Johnson*, 955 F.2d at 181).

Although it finds the incident inexcusably careless and unprofessional, the Court is hard-pressed to find intentional prosecutorial misconduct and agrees with the state court that the curative instruction repaired the mistake. There is no basis in the record for finding that the playing of the autopsy footage was intentional on the part of the state. Furthermore, it appears that the videotape was stopped before the camera focused in on the decedent's body; the image of the decedent's body thus not close-up; nor did this view depict any openings or wounds. Thus, it appears that the videotaped footage was not particularly gruesome. I note that the prosecutor did succeed in introducing photographs showing close-ups of the decedent's bullet wounds, which were arguably more gory. Furthermore, petitioner does not argue, and there is no indication that, the videotape improperly provided the jury with any additional evidence regarding a disputed issue (e.g., intent to kill or identification of the shooter). Thus, I cannot recommend finding that the state courts were unreasonable in determining that the viewing of the videotape by the jury although prejudicial, did not amount to a denial of due process since the autopsy footage was not "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson*, 955 F.2d at 181). Finally, I note that the trial court gave a thorough curative instruction and questioned the jurors as to whether their brief viewing of the autospy videotape impaired their abilities to serve as impartial jurors. No jurors expressed any concerns. Although Kimble argues that curative instructions were insufficient once "the body had been brought into the courtroom," he has not demonstrated that, in his case, the jurors actually disobeyed the trial judge's admonition to disregard the stricken evidence. *See Juarez v. Ryan*, No. SA CV 06-00158 AG (RZ), 2009 WL 514076, at *8 (C.D.Cal. Feb. 28, 2009) ("Petitioner asserts that the 'bell could

not be unrung,' but such rhetorical flourishes alone are no substitute for evidence that, in this particular instance, jurors actually disobeyed the trial judge's admonition to disregard the stricken . . . testimony.") The Supreme Court has held, as the Appellate Division did in Kimble's case, that "[j]urors are presumed to follow such curative instructions." *Richardson v. Marsh*, 481 U.S. 200, 208 (1987). For these reasons, I cannot say that the state courts' rejection of Kimble's claim evidentiary error was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

## V. Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by petitioner be **denied**. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, the Court recommends that no certificate of appealability should issue with respect to any of petitioner's claims.

*/s/ Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: June 18, 2009
        Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: June 18, 2009
       Buffalo, New York